1

2

3

4

5

6

7

8                       IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROGER BETTENCOURT,

11              Petitioner,              No. CIV S-07-2246 FCD DAD P

12        vs.

13   MIKE KNOWLES, Warden,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding pro se with an amended petition for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges the 2005 decision of the

18   California Board of Parole Hearings (the "Board") to deny him parole.  Upon careful

19   consideration of the record and the applicable law, the undersigned will recommend that

20   petitioner's application for habeas corpus relief be denied.

21                          PROCEDURAL BACKGROUND

22            Petitioner is confined pursuant to a judgment of conviction entered in the Santa

23   Clara County Superior Court in 1976.  (Pet., Ex. A.)  In that case, petitioner waived jury trial and,

24   on April 14, 1976, was found guilty of first-degree murder in violation of California Penal Code

25   § 187.  (Id.)  Petitioner was subsequently sentenced to a state prison term of seven years to life

26   /////

with the possibility of parole.  (Id.)[1]  Petitioner has since remained incarcerated.  His sixteenth

parole consideration hearing was held on December 27, 2005.  (Resp't's Mot. to Dismiss, Ex. 1.)

On that date, the Board found petitioner not suitable for parole and deferred his next parole

suitability hearing for two years.  (Pet., Ex. B.)

On May 26, 2006, petitioner filed a petition for a writ of habeas corpus in the

Santa Clara County Superior Court, claiming that the Board's 2005 decision denying him parole

violated his state and federal constitutional rights.  (Answer, Ex. 1.)  The Superior Court rejected

petitioner's claims in a reasoned decision issued July 7, 2006.  (Id., Ex. 2.)  The court's opinion

stated as follows:

> The habeas corpus petition of ROGER A. BETTENCOURT is
> denied.  If the "offense is characterized by the presence of special
> circumstances justifying punishment by death or life without the
> possibility of parole, then these special circumstances are
> particularly egregious acts beyond the minimum necessary to
> sustain the conviction." (*In re Van Houten* (2004) 116 Cal.App.4th
> 339, 352.)  In the instant case, as outlined in the trial court's
> statement of decision, Petitioner surreptitiously followed his ex-
> girlfriend and waited around the corner after she parked her car and
> went into the mall to meet her new boyfriend.  If Petitioner had
> wanted to make contact with his ex-girlfriend and discuss their
> relationship he could have done so earlier when he first followed
> her to her home.  The evidence showed that Petitioner wanted to
> catch his ex-girlfriend with her new boyfriend so that he could
> confront him.  There is ample evidence of lying in wait which is a
> special circumstances [sic] under Penal Code § 190.2, subd.
> (a)(15).  As the trial judge noted: "the place that the Defendant
> decided to lurk [was] admirably suited to his purpose."  "The
> People clearly [showed] a lurking and lying in wait by the
> Defendant which is the hallmark of one type of premeditated and
> deliberated murder."  Based on the special circumstance
> Petitioner's life crime continues to show his unsuitability for
> parole.  Petitioner's numerous other criminal convictions also
> supports [sic] the Board's finding and the parole denial satisfies
> due process.

---

[1]  Petitioner was also convicted in the Monterey County Superior Court in 1976 for the following additional crimes committed shortly after the Santa Clara County murder: first degree burglary in violation of California Penal Code § 459, first degree robbery with use of a firearm in violation of California Penal Code § 211, and two counts of assault with a deadly weapon on a peace officer in violation of California Penal Code § 245.  (Pet., Ex. C at 1-2.)

1   (Id.)  The Superior Court denied petitioner's motion for reconsideration on August 14, 2006.

2   (Id., Ex. 4.)

3           On October 24, 2006, petitioner raised the same constitutional claims in a habeas

4   petition filed in the California Court of Appeal for the First Appellate District.  (Id., Ex. 5.)  By

5   order dated November 9, 2006, the state appellate court denied the petition without prejudice and

6   directed petitioner to re-file his petition in the Court of Appeal for the Sixth Appellate District.

7   (Id., Ex. 6.)  Petitioner did so on December 21, 2006.  (Id., Ex. 7.)  The California Court of

8   Appeal for the Sixth Appellate District summarily denied the petition on January 12, 2007.  (Id.,

9   Ex. 8.)

10          Petitioner next filed a habeas petition in the California Supreme Court on March

11  8, 2007, raising the same claims he had presented in his petitions filed with the lower California

12  courts.  (Answer, Ex. 9.)  That petition was denied by order filed August 8, 2007, with citation to

13  People v. Duvall, 9 Cal. 4th 464, 474 (1995).  (Pet., appended documents.)

14                          FACTUAL BACKGROUND

15          In his petition filed with this court on October 22, 2007[2], petitioner incorporated

16  the description of the facts surrounding his 1975 murder of Thomas Mallory, as recited by the

17  Santa Clara County Superior Court in a 1976 Memorandum of Decision.  (Pet., Ex. A.)  The

18  Superior Court's decision stated, in relevant part:

19          It is conceded by both sides that a homicide was committed on the
            person of Thomas Mallory on November 6, 1975, and that the
20          defendant Roger Bettencourt committed the homicide.  Leaving for
            determination by the Court, a jury having been waived, the
21          decisions as to the nature and seriousness in terms of degree of the
            homicide . . . .
22
            In its decision the Court has found that the nature of the homicide
23          was murder and that the murder was in the first degree.  Does the
            evidence show a motive to kill?  Does the evidence show
24          premeditation and deliberation?

25  ────────────────

26          [2]  Petitioner subsequently filed an amended petition on November 17, 2007, and it is that
    amended petition that is the operative pleading in this action.

                                        3

Defendant did have a motive for killing.  Without fault on his part, he was pursued, while in Soledad [for a burglary conviction], by the People's primary witness Patricia Campbell.  Love letters were exchanged between the parties, nude pictures of the young lady sent to him, approximately 50 visits were made by the lady to the defendant's place of confinement.  Promises of marriage were made by the lady not only to the defendant but to the penal authorities as well.  All of Miss Campbell's objective protestations up to and shortly after the defendant's release from custody bespoke of mutual love, marriage, and the promise of family.  Yet sometime within one and a half months of the defendant's release from custody, Miss Campbell's interest in the defendant began to wane.  In late October of 1975, the defendant has testified that she confessed to him a casual, but intimate dalliance with a former gentleman friend.  To this news, the defendant reacted impulsively and fractured Patricia Campbell's jaw.  From the evidence it is clear that from this point the loving relationship of the parties began to deteriorate.

On October 24, 1975, the defendant states that he convinced Patricia Campbell to go to Merced with him to see his parole officer.  It is his belief that she traveled with him to Merced willingly.  Yet on October 25, 1975, he is arrested in Atwater, California, for the kidnapping of Patricia Campbell and also detained because of a parole hold.  He is jailed for seven days.

On his release, he is hostile and angry.  It is his belief that he did not kidnap Patti Campbell.  He did not do anything to be jailed.  He believes that Patti Campbell could have secured his early release from an unjust imprisonment.  From the defendant's point of view Patti Campbell should be taking care of his business rather than sleeping around with everybody else.

* * *

To ensure that he is not returned to prison; and to also ensure that he may gain access to Patti Campbell and talk to her or kill her, he steals two guns, a 30.06 rifle and a 12 gauge shotgun.  This is done, despite the knowledge that he is forbidden to have weapons as a parolee.  In the company of two other young men, he travels to Santa Clara County arriving on or about November 4, 1975.  He knows that he should not leave Merced and return to the San Jose area, but he comes seeking an accounting with Patti Campbell.

In San Jose, his anger is further inflamed by news that Patti is seeing another young man.  She is receiving advice from a person named Tom.  Tom is acting as a protector of Patti Campbell.  He is telling Patti to send the defendant to jail for kidnapping.  This man Tom Mallory is a snitch in the defendant's opinion, since Tom Mallory wants to place the defendant into prison.  He would rather

be six feet under than in prison and he has the weaponry to ensure that he will not return.

Preparation by the defendant for the accounting continues.  He has prior to November 4th test fired the 30.06 rifle with its telescopic sight.  He realizes that it is a good long range weapon.  He has shot it in practice three times.  For close in shooting, he prepares the shotgun by sawing off the barrel to 13 1/4 inches.  Because he realizes that without a driver's license he can't purchase ammunition for the rifle he secures the help of Vikki Parker, a lady friend who is in love with the defendant.  For him she purchases three boxes of 30.06 ammunition.  Shotgun ammunition he can buy himself, and he does so.  On November 6, 1975, he works himself into an ugly mood.  He rehears stories of what Tom has said.  He weighs and considers killing Patti.  He mutters threats.  Knowing Patti Campbell like the back of his hand he watches the clock on the evening of November 6 and proceeds to steal or, as is more likely, openly confiscates without protest a Polara vehicle in the possession of Vikki Parker.  He leaves the Parker residence at 8:30 P.M., goes to the home of Billy Hardcastle and secures his property, the two guns and his clothes.  On leaving the Poinciana Street home of Billy Hardcastle he proceeds to Patti Campbell's place of employment in the Pruneyard in San Jose and a confrontation with her.  He expects that he will also meet with Patti's new boy friend Tom Mallory.  From the evidence, this expectation on the defendant's part, arises as the defendant follows Patricia Campbell to the shopping center at Valley Fair in San Jose.

* * *

The defendant observes Patti Campbell leaving the Pruneyard parking lot.  He follows her, making no attempt to stop or communicate with her.  She drives to her home.  She parks, dashes in and returns to her car.  At no time does the defendant attempt to communicate with her, although this may easily be done.

Patti Campbell drives on to Valley Fair, an area of San Jose that is unfamiliar to the defendant.  Because he is forced to stop for a traffic signal, Patti Campbell enters the Valley Fair parking lot well ahead of the defendant, exits her car and disappears from the defendant's view.  When the signal permits him to cross Stevens Creek the defendant drives to the place where Patti has parked.  Her red Mustang is in a parking stall at the base of a "Y" formed by a building on the left arm of the "Y" and a parking ramp on the right arm.  The tail of the "Y" being a driveway area between the ramp and the building . . . .

At this point, there is a serious dispute in the evidence as to what the defendant did.  His testimony at trial is that he waited by the Campbell Mustang, began to give up on the idea of seeing Patti, went for gas exiting the parking lot onto Stevens Creek.  After

securing gas he traveled around the Valley Fair parking lot returning to the Mustang's location along the driveway that forms the tail of the "Y" and espied Patti Campbell and a male person. Thinking that something sinister may be happening, the defendant drove up to the couple, exited his vehicle saying, "What is going on?" The People's version of the events immediately preceding the fatal confrontation is supplied by admissions made by the defendant to Patti Campbell and other evidence. This version is that the defendant waited at Patti's car, actually laid down in it in the back seat with a gun, found that it was too small, returned to his car and waited. He observed the victim and Miss Campbell come to her Mustang, load a bicycle into the trunk, kiss and grew madder and madder. He decided to drive out from his parked place at the tail of the "Y" and confront the two people. Bringing his car to a screeching halt he jumped out wielding a 30.06 rifle in his hands saying: "Hold it right there or I'll blow your head off." The People clearly indicate by these facts a lurking and lying-in-wait by the defendant which is the hallmark of one type of premeditated and deliberated murder.

Which version is the more reasonable and logical? In the Court's view it is the People's version. The reason that defendant gave for following Patti Campbell on November 6, 1975, was to talk with her. The evidence shows that when the defendant, however, slowly, decides on a course of action he pursues it to completion. In this instance after having followed Patti Campbell so far, he was not going to give up his vigil so easily. The evidence further shows that the defendant is unfamiliar with the San Jose area and Valley Fair. It seems illogical to assume that a person with his knowledge of the locality would look for a different route to get back to the eventual death scene via the back door, risking losing his way and a loss of precious time. More logically he would return to the scene from the way in which he left it. Further isn't it just too coincidental that he returns to the scene at a time when the preparations of the parties in storing the bicycle are complete and they are about to leave? Most telling, however, is that the place that the defendant has decided to lurk is admirably suited to his purposes. Even in daytime, the driveway area between the ramp and the building are in dark shadows. . . . His vehicle is unlikely to be seen by the unwary. His vantage point provides him with a clear unimpeded view of the Mustang, a good place to wait and watch.

In a scene that is somehow reminiscent of the last act of Bizet's Carmen, the defendant confronts the eventual victim and Patricia Campbell. He states: "Hold it right there or I'll blow your head off" aiming the gun at Tom Mallory. Mallory raises his hands saying something to the following effect, "Hey, man, I don't have anything against you." Patti Campbell, remarkably, appears without fear or great concern. She thinks: "Oh . . . what is that . . . doing here. Why bother me. He is botching everything up."

6

1
2
3
4
5

Tom Mallory's pacifistic and friendly overtures to the defendant momentarily spare his life.  In fact, there is no evidence worthy of consideration to indicate that Tom Mallory tried to aggravate or escalate the defendant's apparent hostility.  Nor is there any evidence to show that the victim acted aggressively or angrily towards the defendant or to Patti Campbell.  Without realizing it, his opening overture was the only key to his survival, but this last chance was quickly lost.

6
7
8
9
10
11
12
13
14
15

Patti and Tom walk towards the defendant's car.  The defendant eventually makes it clear that he wants Patti in his car to "talk to her."  He doesn't want Tom.  As or shortly after Patti gets in from the driver's side of the Polara she says to the defendant, "Give Tom my keys."  Obviously meaning that the defendant is to give the keys to her car to Tom so that he may use her Mustang.  Defendant's growing conviction that this is the snitch Tom is crystalized.  He confronts the victim with the statement, "You, Tom?"  Tom Mallory denies this.  The defendant accuses the victim of being the person who desires to see him imprisoned; who wants Patti to press charges.  In a cat and mouse game, the defendant attempts to get Tom to reveal his true identity.  Tom neither admits nor denies his real identity.  Roger Bettencourt makes the final accusation, "You are the one trying to hurt me.  Play the hero and stuff."  Tom's evasions have confirmed the defendant's suspicions as to the identity of this person.  Roger Bettencourt had just held court.  Roger Bettencourt's hostility was now fully reawakened.  He was getting madder and madder.  He thought of what Smoky Hardcastle had said regarding Tom, Patricia Campbell, and himself.  Tom Mallory was lying.

16
17
18
19
20

In some way, Tom Mallory was caused to turn his back from his direct confrontation with Roger Bettencourt.  He proceeded to walk towards the vehicle of Patricia Campbell, parked opposite to the defendant's Polara and some 25 feet away. . . .  Roger Bettencourt got madder and madder.  "Tom was a snitch."  Roger Bettencourt hated snitches.  Snitches sent people to prison.  Roger Bettencourt raised his gun, aimed deliberately for seven to eight seconds and calmly and coldly fired.

* * *

21
22
23

Without determining what damage he had wrought or to aid his victim the defendant hurriedly fled.  He knew he had hit the victim because Patti told the defendant that Tom had been shot in the back.

24

(Pet. filed Oct. 22, 2007, Ex. A at 5-14.)[3]

25
26

---

[3]  Unless otherwise indicated, all page citations herein are to the page numbers reflected on the court's electronic filing system.

1            In denying petitioner parole in 2005, the Board also relied on the following

2    summary of the crimes committed by petitioner immediately following his murder of Mallory:

> Bettencourt and Ms. Campbell had gone to the Merced area, to Yosemite Park, and as far away as Long Beach before they began their return to the San Jose area.  They had a car accident on November 10, 1975, near Camp Robertson, southern Monterey County.  They were left without a car and continued their journey on foot.  Finally, on November 11, 1975, Bettencourt and Campbell broke into a trailer home in Bradley, California.  The victim, Donald D. Woody, returned home at about [9:30 in the evening] and was accosted by Bettencourt who was armed with a shotgun.  Bettencourt instructed Campbell to tie the victim up, which she did.  Initially, however, Bettencourt retied the bonds, leaving them loose enough that the victim was expected to free himself within 30 minutes.  The victim then gave Bettencourt the keys to his car and they took approximately $89.25 worth of property and money from the victim.  Bettencourt also placed a couch and a large stuffed chair over the victim to prevent him from freeing himself too quickly.  The victim indicated that Ms. Campbell seemed to help Bettencourt willingly.  Mr. Woody eventually freed himself, contacted law enforcement officials at approximately 2155 hours, informing them of the crimes and that his car had also been stolen.  As a result, at approximately 2220 hours, Monterey County Sheriff Deputies observed Bettencourt and Campbell driving and attempted to stop them.  This resulted in a high-speed chaise with speeds up to 80 miles an hour on a curvy country road, which only ended due to the road coming to a dead end at a farmhouse, where the deputies were able to exit the car.  Bettencourt had already fired several shotgun rounds at them.  The shootout, which involved numerous rounds being exchanged between Bettencourt and the deputies erupted.  At one point, Bettencourt used Ms. Campbell as a shield while he reloaded.  As noted above, only one of the deputies was injured and that was minor.  This incident ended when Bettencourt was shot in the foot and surrendered.  The number of rounds fired by Bettencourt is unclear.  One report indicates that four spent 30-06 rounds and three expended shotgun shells were found on the ground near the stolen car.  The report by Deputy Price indicates he believes Bettencourt fired at least 20 unspecified rounds.  The result of the second search for expended rounds, which was to occur after daybreak, are not located within the available reports.  This information is drawn from Monterey Sheriffs Department reports and Probation Officer's Reports from the San Jose Police Department.

(Answer, Ex. 1 at 24-27.)

/////

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861-62 (9th Cir. 1993) (quoting Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

In reviewing a federal habeas claim, the court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). As noted above, the Santa Clara County Superior Court provided the last reasoned state court decision on petitioner's habeas claims in its judgment of July 7, 2006.

9

1    II.  Petitioner's Claims

2           Petitioner specifically claims that the Board's 2005 decision finding him

3    unsuitable for parole violated his rights under the Due Process, Ex Post Facto, and Cruel and

4    Unusual Punishment Clauses of the U.S. Constitution.[4]

5           Petitioner's due process challenges to the Board's 2005 decision are numerous.

6    First, he argues that the record contains no evidence indicating that he is currently dangerous,

7    because: (1) there is no evidence that his offense conduct was more cruel or callous than that

8    minimally necessary to sustain a first degree murder conviction (Am. Pet. at 17-18, 27;  Reply at

9    5-6); (2) there is no evidence that he needs additional self-help (Am. Pet. at 26; Reply at 6-7, 9);

10   (3) there is no evidence that his gains are recent or that he currently exhibits an escalating pattern

11   of criminal conduct (Am. Pet. at 28); and (4) the immutable facts of his crime and prior criminal

12   history do not show that he is currently dangerous in light of his exemplary prison record and

13   positive psychological evaluations (Am. Pet. at 17-24; Reply at 6-9, 10-12).  Petitioner also

14   argues that the Board relied on unreliable evidence of unsuitability and ignored relevant evidence

15   of suitability identified by the applicable California regulations.  (Am. Pet. at 29-31.)  Second, he

16   contends that the Board deprived him of due process by applying parole suitability criteria

17   designed for use under California's Determinate Sentencing Law ("DSL"), rather than the criteria

18   applicable under the Indeterminate Sentencing Law ("ISL").  (Am. Pet. at 14-15.)  Third,

19   petitioner contends that the Board "has totally failed in its intended function and has reduced its

20   function to the advancement of contrary political agendas."  (Id. at 33.)  Fourth, petitioner argues

21   that the Board's 2005 deferral of his next parole suitability hearing for two years is unsupported

22   by any evidence.  (Am. Pet. at 32.)[5]

23   _____

24        [4]  Petitioner also challenges the decision under parallel provisions of the California
     Constitution, but this court may not review those purely state law claims under 28 U.S.C. § 2254.

25   Estelle, 502 U.S. at 67-68.

26        [5]  Petitioner notes that in 2001 the Board found his motive for the murder of Thomas
     Mallory inexplicable or trivial despite the trial judge's statements in his 1976 Memorandum of

1    Next, petitioner argues that the Board also violated his rights under the Ex Post

2  Facto Clause by relying on immutable factors and ignoring relevant evidence of his suitability for

3  release in denying him parole.  (Id. at 31; Reply at 10-12.)  Petitioner also suggests that he is

4  challenging the application of the DSL suitability criteria in his case on ex post facto grounds.

5  (See Am. Pet. at 14.)

6    Lastly, petitioner argues that "his continued incarceration based on unjustifiable

7  denial of parole violate[s] the Eighth Amendment prohibition against cruel and unusual

8  punishment."  (Id. at 35.)

9    The court will address each of petitioner's claims in turn.

10    A.  Due Process and Whether Some Evidence Supports the Finding of Unsuitability

11      1.  Due Process in the California Parole Context

12    The Due Process Clause of the Fourteenth Amendment prohibits state action that

13  deprives a person of life, liberty, or property without due process of law.  A litigant alleging a

14  due process violation must first demonstrate that he was deprived of a liberty or property interest

15  protected by the Due Process Clause and then show that the procedures attendant upon the

16  deprivation were not constitutionally sufficient.  Ky. Dep't of Corr. v. Thompson, 490 U.S. 454,

17  459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

18    A protected liberty interest may arise either from (1) the Due Process Clause of

19  the United States Constitution "by reason of guarantees implicit in the word 'liberty,'" or (2) "an

20  expectation or interest created by state laws or policies."  Wilkinson v. Austin 545 U.S. 209, 221

21  (2005) (citations omitted).  See also Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987).  The

22  _____

23  Decision indicating that Ms. Campbell bore "some responsibility for the events of November 6."
   (Am. Pet. at 13) (quoting Pet., Ex. A at 13).  According to petitioner, this finding by the Board in
24  2001 shows "the arbitrary and capricious nature of BPT generally, and its willingness to render
   decisions contrary to the factual findings and evidence presented at trial."  (Am. Pet. at 14.)
25  However, the Board's 2001 decision to deny petitioner parole is not at issue in this habeas action
   which challenges the 2005 decision to deny parole.  Moreover, it has not been established that
26  the Board's statement in 2001 regarding petitioner's motive was without evidentiary support.
   Accordingly, petitioner's argument in this regard is not persuasive.

1   United States Constitution does not, of its own force, create a protected liberty interest in a parole

2   date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, "a

3   state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release

4   will be granted' when or unless certain designated findings are made, and thereby gives rise to a

5   constitutional liberty interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of

6   Neb. Penal & Corr. Complex, 442 U.S. 1, 12 (1979)).  Under that reasoning, California's parole

7   scheme gives rise to a cognizable liberty interest in release on parole, even for prisoners who

8   have not already been granted a parole date.  Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123,

9   1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion, 306 F.3d

10  at 903; see also In re Lawrence, 44 Cal. 4th 1181, 1204, 1210, 1221 (2008).[6]  Accordingly, this

11  court must examine whether the state court's conclusion that California provided the

12  constitutionally-required procedural safeguards when it deprived petitioner of his protected

13  liberty interest in parole is contrary to or an unreasonable application of federal law.

14          Because "parole-related decisions are not part of the criminal prosecution, the full

15  panoply of rights due a defendant in such a proceeding is not constitutionally mandated."

16  Jancsek v. Or. Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987).  Where, as here, parole

17  statutes give rise to a protected liberty interest, due process is satisfied in the context of a hearing

18  to set a parole date where a prisoner is afforded notice of the hearing, an opportunity to be heard

19  and, if parole is denied, a statement of the reasons for the denial.  Id. at 1390 (quoting

20  Greenholtz, 442 U.S. at 16).  See also Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (describing

21  the procedural process due in cases involving parole).  Violation of state mandated procedures

22  /////

23

24          [6] Respondent argues that petitioner lacks a federally-protected liberty interest in parole.
    (Answer & Mem. of  P. &  A. at 3-4.)  Specifically, respondent "acknowledges that in [Sass] the
25  Ninth Circuit held that California's parole statute creates a federal liberty interest in parole under
    the mandatory-language analysis of Greenholtz, but preserves the argument, which is pending en
26  banc review in the Ninth Circuit.  Hayward v. Marshall, 527 F.3d 797 (9th Cir. 2008)."  (Id.)

1 will constitute a due process violation only if the violation causes a fundamentally unfair result.

2 Estelle, 502 U.S. at 65.

3        In California, the setting of a prisoner's parole date is conditioned on a finding of

4 suitability.  Cal. Penal Code § 3041; Cal. Code Regs. tit. 15, §§ 2401 & 2402.  The requirements

5 of due process in the parole suitability setting are satisfied "if some evidence supports the

6 decision."  McQuillion, 306 F.3d at 904 (citing Superintendent v. Hill, 472 U.S. 445, 456

7 (1985)).  See also Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Perveler v. Estelle,

8 974 F.2d 1132, 1134 (9th Cir. 1992)).  For purposes of AEDPA, Hill's "some evidence" standard

9 is clearly established federal law.  Sass, 461 F.3d at 1129 (citing Hill, 472 U.S. at 456).[7]  "The

10 'some evidence' standard is minimally stringent," and a decision will be upheld if there is any

11 evidence in the record that could support the conclusion reached by the factfinder.  Powell, 33

12 F.3d at 40 (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)); Toussaint v. McCarthy,

13 801 F.2d 1080, 1105 (9th Cir. 1986).  However, "the evidence underlying the board's decision

14 must have some indicia of reliability."  Jancsek, 833 F.2d at 1390.  See also Perveler, 974 F.2d at

15 1134.  In determining whether the "some evidence" standard is satisfied, a court need not

16 examine the entire record, independently assess the credibility of witnesses, or the weigh the

17 evidence.  Toussaint, 801 F.2d at 1105.  The court must simply determine whether there is any

18 reliable evidence in the record that could support the conclusion reached.  Id.

19        When a federal court assesses whether a state parole board's suitability

20 determination was supported by "some evidence" in a habeas case, the analysis "is framed by the

21 statutes and regulations governing parole suitability determinations in the relevant state."  Irons

22 v. Carey, 505 F.3d 846, 851 (9th Cir. 2007).  This court must therefore:

23 ////

24

_____

25        [7] Respondent argues that no clearly established federal law holds that parole suitability
determinations must be supported by "some evidence."  (Answer & Mem. of P. & A. at 7-8.)
26 However, binding precedent is to the contrary.  Sass, 461 F.3d at 1129.

look to California law to determine the findings that are necessary
to deem a prisoner unsuitable for parole, and then must review the
record in order to determine whether the state court decision
holding that these findings were supported by "some evidence" in
[petitioner's] case constituted an unreasonable application of the
some evidence" principle articulated in Hill.

Id.

California prisoners serving indeterminate prison sentences "may serve up to life in prison, but [] become eligible for parole consideration after serving minimum terms of confinement." In re Dannenberg, 34 Cal. 4th 1061, 1078 (2005). The Board normally sets a parole release date one year prior to the inmate's minimum eligible parole release date, and does so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." In re Lawrence, 44 Cal. 4th at 1202 (citing Cal. Penal Code § 3041(a)).

California law provides that the Board must set a release date "unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed [.]" Cal. Penal Code § 3041(b). The overriding concern in determining parole suitability is public safety. Dannenberg, 34 Cal. 4th at 1086. This "core determination of 'public safety' . . . involves an assessment of an inmates current dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in original). See also Cal. Code Regs. tit. 15, § 2281(a) ("Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.") Accordingly, under California law,

when a court reviews a decision of the Board or the Governor, the
relevant inquiry is whether some evidence supports the decision of
the Board or the Governor that the inmate constitutes a current
threat to public safety, and not merely whether some evidence
confirms the existence of certain factual findings.

1  Id. at 1212 (citing In re Rosenkrantz, 29 Cal. 4th 616, 658 (2002); Dannenberg, 34 Cal. 4th at

2  1071; and In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

3          The governing California regulations direct the Board to consider all relevant,

4  reliable information available regarding

5          the circumstances of the prisoner's social history; past and present
           mental state; past criminal history, including involvement in other
6          criminal misconduct which is reliably documented; the base and
           other commitment offenses, including behavior before, during and
7          after the crime; past and present attitude toward the crime; any
           conditions of treatment or control, including the use of special
8          conditions under which the prisoner may safely be released to the
           community; and any other information which bears on the
9          prisoner's suitability for release.

10  Cal. Code Regs., tit. 15, § 2281(b).

11          The regulation identifies circumstances that tend to show suitability or

12  unsuitability for release.  Id., § 2281(c) & (d).  The following circumstances have been identified

13  as tending to show that a prisoner is suitable for release:  (1) the prisoner has no juvenile record

14  of assaulting others or committing crimes with a potential of personal harm to victims; (2) the

15  prisoner has experienced reasonably stable relationships with others; (3) the prisoner has

16  performed acts that tend to indicate the presence of remorse or has given indications that he

17  understands the nature and magnitude of his offense; (4) the prisoner committed his crime as the

18  result of significant stress in his life; (5) the prisoner's criminal behavior resulted from having

19  been victimized by battered women syndrome; (6) the prisoner lacks a significant history of

20  violent crime; (8) the prisoner's present age reduces the probability of recidivism; (9) the

21  prisoner has made realistic plans for release or has developed marketable skills that can be put to

22  use upon release; and (10) institutional activities indicate an enhanced ability to function within

23  the law upon release.  Id., § 2281(d).

24          The following circumstances have been identified as tending to show that a

25  prisoner is unsuitable for release: (1) the prisoner committed the offense in an especially heinous,

26  atrocious, or cruel manner; (2) the prisoner had a previous record of violence; (3) the prisoner has

15

1   an unstable social history; (4) the prisoner's crime was a sadistic sexual offense; (5) the prisoner

2   had a lengthy history of severe mental problems related to the offense; and (6) the prisoner has

3   engaged in serious misconduct in prison.  Id., § 2281(c).  In deciding whether the prisoner's

4   offense was committed in an especially heinous, atrocious, or cruel manner, the Board is to

5   consider whether: (1) multiple victims were attacked, injured, or killed in the same or separate

6   incidents; (2) the offense was carried out in a dispassionate and calculated manner, such as an

7   execution-style murder; (3) the victim was abused, defiled or mutilated during or after the

8   offense; (4) the offense was carried out in a manner that demonstrated an exceptionally callous

9   disregard for human suffering; and (5) the motive for the crime is inexplicable or very trivial in

10  relation to the offense.  Id., § 2281(c)(1)(A) - (E).

11          In the end, under current state law as recently clarified by the California Supreme

12  Court,

13          the determination whether an inmate poses a current danger is not
            dependent upon whether his or her commitment offense is more or
14          less egregious than other, similar crimes.  (Dannenberg, supra, 34
            Cal. 4th at pp 1083-84 [parallel citations omitted].)  Nor is it
15          dependent solely upon whether the circumstances of the offense
            exhibit viciousness above the minimum elements required for
16          conviction of that offense.  Rather, the relevant inquiry is whether
            the circumstances of the commitment offense, when considered in
17          light of other facts in the record, are such that they continue to be
            predictive of current dangerousness many years after commission
18          of the offense.  This inquiry is, by necessity and by statutory
            mandate, an individualized one, and cannot be undertaken simply
19          by examining the circumstances of the crime in isolation, without
            consideration of the passage of time or the attendant changes in the
20          inmate's psychological or mental attitude. [citations omitted].

21  Lawrence, 44 Cal. 4th at 1221.

22          In recent years the Ninth Circuit Court of Appeals has similarly concluded that,

23  given the liberty interest that California prisoners have in release on parole, a continued reliance

24  upon an unchanging factor to support a finding of unsuitability for parole over time may

25  constitute a violation of due process.  The court has addressed this issue in three significant

26  cases, each of which will be discussed below.

16

1          First, in <u>Biggs v. Terhune</u>, the Ninth Circuit recognized that a continued reliance

2    on an unchanging factor such as the circumstances of the offense could at some point result in a

3    due process violation.  334 F.3d at 916-17; <u>see also</u> <u>Irons</u>, 505 F.3d at 853 (acknowledging that

4    <u>Biggs</u> represents the law of the circuit); <u>Sass</u>, 461 F.3d at 1129 (same).  In that case, the court

5    rejected several of the reasons given by the Board for finding the petitioner unsuitable for parole,

6    but it upheld three:  (1) petitioner's commitment offense involved the murder of a witness; (2)

7    the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of

8    another; and (3) petitioner could benefit from therapy.  <u>Biggs</u>, 334 F.3d at 913.  However, the

9    court in <u>Biggs</u> cautioned that a parole denial based on the Board's continued reliance solely upon

10   the gravity of the offense of conviction and petitioner's conduct prior to committing that offense

11   could, at some point, violate due process.  In this regard, the court observed:

12              As in the present instance, the parole board's sole supportable
                reliance on the gravity of the offense and conduct prior to
13              imprisonment to justify denial of parole can be initially justified as
                fulfilling the requirements set forth by state law.  Over time,
14              however, should Biggs continue to demonstrate exemplary
                behavior and evidence of rehabilitation, denying him a parole date
15              simply because of the nature of Biggs' offense and prior conduct
                would raise serious questions involving his liberty interest in
16              parole.

17   <u>Id.</u> at 916.  The court in <u>Biggs</u> also stated that "[a] continued reliance in the future on an

18   unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

19   contrary to the rehabilitative goals espoused by the prison system and could result in a due

20   process violation."  <u>Id.</u> at 917.

21          In <u>Sass v. California Board of Prison Terms</u>, the Ninth Circuit reviewed the

22   Board's decision to deny parole that was based on the gravity of the petitioner's offenses of

23   conviction in combination with his prior offenses.  461 F.3d at 1126.  Citing the decision in

24   <u>Biggs</u>, the petitioner contended that reliance on these unchanging factors violated due process.

25   The court disagreed, concluding that the factors amounted to "some evidence" to support the

26   Board's determination.  <u>Id.</u> at 1129.  The court provided the following explanation for its holding:

17

1        While upholding an unsuitability determination based on these
         same factors, we previously acknowledged that "continued reliance
2        in the future on an unchanging factor, the circumstance of the
         offense and conduct prior to imprisonment, runs contrary to the
3        rehabilitative goals espoused by the prison system and *could* result
         in a due process violation." Biggs, 334 F.3d at 917 (emphasis
4        added).  Under AEDPA it is not our function to speculate about
         how future parole hearings could proceed.  Cf. id.  The evidence of
5        Sass' prior offenses and the gravity of his convicted offenses
         constitute some evidence to support the Board's decision.
6        Consequently, the state court decisions upholding the denials were
         neither contrary to, nor did they involve an unreasonable
7        application of, clearly established Federal law as determined by the
         Supreme Court of the United States.  28 U.S.C. § 2254(d).

8

9    Id.

10       In Irons v. Carey, the Ninth Circuit sought to harmonize the holdings in Biggs and

11   Sass, stating as follows:

12       Because the murder Sass committed was less callous and cruel than
         the one committed by Irons, and because Sass was likewise denied
13       parole in spite of exemplary conduct in prison and evidence of
         rehabilitation, our decision in Sass precludes us from accepting
14       Iron's due process argument or otherwise affirming the district
         court's grant of relief.

15
         We note that in all the cases in which we have held that a parole
16       board's decision to deem a prisoner unsuitable for parole solely on
         the basis of his commitment offense comports with due process,
17       the decision was made before the inmate had served the minimum
         number of years required by his sentence. Specifically, in Biggs,
18       Sass, and here, the petitioners had not served the minimum number
         of years to which they had been sentenced at the time of the
19       challenged parole denial by the Board.  Biggs, 334 F.3d at 912;
         Sass, 461 F.3d at 1125.  All we held in those cases and all we hold
20       today, therefore, is that, given the particular circumstances of the
         offenses in these cases, due process was not violated when these
21       prisoners were deemed unsuitable for parole prior to the expiration
         of their minimum terms.

22
         Furthermore, we note that in Sass and in the case before us there
23       was substantial evidence in the record demonstrating rehabilitation.
         In both cases, the California Board of Prison Terms appeared to
24       give little or no weight to this evidence in reaching its conclusion
         that Sass and Irons presently constituted a danger to society and
25       thus were unsuitable for parole. We hope that the Board will come
         to recognize that in some cases, indefinite detention based solely
26       on an inmate's commitment offense, regardless of the extent of his

                                      18

rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes. Biggs, 334 F.3d at 917.

Irons, 505 F.3d at 853-54.[8]

2. Petitioner's December 27, 2005 Parole Suitability Hearing

Petitioner appeared at his December 27, 2005 parole suitability hearing and was represented by counsel. At the conclusion of the hearing the Board deliberated and then announced its decision denying petitioner parole and deferring his next suitability hearing for two years. In addressing the factors it considered in reaching its decision, the Board in this case stated as follows:

> **Presiding Commissioner Garner:** Mr. Bettencourt, the Panel's reviewed all the information received from the public and relied on the following circumstances in concluding that you're not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if you're released from prison. And, sir, we always start with the commitment offense. You've been through this drill before and the Panel has concluded that the offense was carried out in an especially cruel and callous manner. We have multiple victims that were attacked and one that was killed, and also that a .40 caliber rifle was used on an individual that, for all counts we can determine, was doing what you told him to do, by your own accounts didn't represent any kind of threat to you, and essentially complying. Secondly, we have the situation with the two Monterey County Deputy Sheriffs, the peace officers, and the Panel understood what you said and what you were attempting to do, because you didn't want to go back to prison. The Panel also concluded the offense was carried out in a dispassionate manner, such as an execution-style. Quite frankly, that's what happened with the young man who was just getting off of work. The offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering. And these conclusions were drawn from the Board report of October 2005[.]

---

[8] The California Supreme Court has also acknowledged that the aggravated nature of the commitment offense, over time, may fail to provide "some evidence" that the inmate remains a current threat to public safety. In re Lawrence, 44 Cal. 4th at 1218-20 & n.20. Additionally, a recent panel of the Ninth Circuit in Hayward v. Marshall, 512 F.3d 536, 546-47 (9th Cir. 2008), determined that under the "unusual circumstances" of that case the unchanging factor of the gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the governor's decision to reverse a parole grant on the basis that the petitioner posed a continuing danger to society. However, on May 16, 2008, the Court of Appeals decided to rehear that case en banc. Hayward v. Marshall, 527 F.3d 797 (9th Cir. 2008). Therefore, the panel decision in Hayward is no longer citable precedent.

* * *

Sir, the Panel also concluded that on previous occasions that you attempted to inflict serious injuries on victims, that you have a record of violence and assaultive behavior, escalating pattern of criminal conduct and violence, that you failed many attempts on the part of society to correct your criminality starting with juvenile probation, adult probation, CYA commitment, prior prison terms. And this prior criminality and unstable history involved four terms at CYA, arrests for 496, receiving stolen property, robbery, assault with a deadly weapon, and I think it's mentioned by the Commissioner here, you probably spent most of your adult life in prison.  Quite a bit of it, anyway.

**Inmate Bettencourt:**  People change.

**Presiding Commissioner Garner:**  Yeah.  Sir, the Panel feels that you haven't participated sufficiently in self-help.  And let me digress for a moment.  The Panel last year – I read specifically, I wanted to go back and read their finding and recommendation to you.  Those people had the key to you getting out.  The key was in their hand and what they were telling you is what you need to do, and we're going to do the same thing today and I hope that the subsequent Panel's going to take a look at your progress.  So you call – I think the term spinning your wheels or something like that.  Look at what the Panel tells you as a key.  It's a key that's going to get you what you want.  If you call it spinning wheels, that's fine, but that's the main thing that we want to convey to you today is – and maybe you just didn't understand the importance that they left with you last time.  We did note the 115 in May of 2002 and while we concluded that it was not violence-related, it did possibly relate to a serious breach of institutional security and safety, and I think you understand what I'm speaking about there.  The October '05 psych report by Dr. Sergeant is favorable.  The Panel read it, the Panel reaches the same conclusion the doctor did.  With respect to your parole plans, the Panel noted you have housing waiting for you with your father.  You also have job offers that are waiting for you.  The 3042 responses, the District Attorney of Santa Clara County has appeared and indicated opposition.  Under remarks, the one thing that we're concerned about is particularly in light of not adhering to the advice given is that some of the gains you've got may be recent and we need to see it over a sustained period of time.  Nevertheless, your vocational reports, they're great.  You're doing a good job.  We commend you for being violence-free in prison, also give you recognition for being a lead person.  Those are things that basically are attaching responsibility and respect, and I think those are things that you've achieved by getting these positions.  Sir, in a separate decision the Panel finds that you've been convicted of murder and it's not reasonable that parole would be granted at a hearing during the next two years, and that what we're going to do is – excuse me – is that we're going to go ahead and

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

without objection use the Statement of Facts that was read from the Board report of 2005 with respect to the commitment crime. That was also going to indicate the victims were attacked, injured, killed in separate events. One was killed, the others were injured. The offense was carried out in a dispassionate and calculated manner. The offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering. As previously noted, the violent behavior goes back a long way, juvenile crimes, four terms to CYA, and that, again, we're going to note that the most recent 115 in 2002 the Panel did not consider it to be violence-related but, again, did consider it as a possible serious breach of security and safety inside this institution. The psychological report by Dr. Sergeant from October 2005 is fine but, again, we're going to note that you haven't completed the necessary program which is essential, which is what the Panel told you two years ago, and it's what we're going to tell you again today, is get yourself involved in self-help and do what you can in that regard. We say if available. In fact, that will be in our final recommendations as oftentimes it's not available. The story you've prepared, I can see that's one of the things we also encourage people to do, to get the insight. Granted, we only had – I don't know what portion, but we didn't have the entire –

**Inmate Bettencourt:** More than five hundred pages.

**Presiding Commissioner Garner:** Right, okay.

**Inmate Bettencourt:** Yes.

**Presiding Commissioner Garner:** So, therefore, a longer period of observation and evaluation is required before the Board should find that you're suitable for parole. And we're going to recommend that you remain disciplinary-free. And, again, if it's available upgrade yourself educationally, and if it's available upgrade yourself with respect to self-help.

. . . .

**Deputy District Attorney Rico:** One matter, if I might. I know that you indicated that the Panel reached the same conclusions as the author of the psych eval, and the last line of the author of the psych eval it says, "This inmate's growth and positive development provide a healthy foundation which can allow for his success in the community." I (indiscernible) your meaning is that he is developing the foundation but he's not there yet, rather that he is –

**Presiding Commissioner Garner:** Correct.

(Answer, Ex. 1, Part 1 at 54-63.)

/////

21

3. The Merits

Petitioner contends that this decision to deny him parole violated his federal due process rights because no evidence in the record supports the conclusion that he currently presents a threat to public safety.  As recited above, the Board based its conclusion in this regard on four findings.  First, it found that petitioner's crime was especially cruel and callous.  See Cal. Code Regs. tit. 15, § 2281(c)(1).  The Board so concluded based on specific findings that multiple victims were attacked (see id., § 2281(c)(1)(A)), that petitioner used a .30 caliber rifle on an individual who posed no threat and was complying with petitioner's demands, that the offense was carried out in a dispassionate manner, such as an execution-style murder (see id., § 2281(c)(1)(B)), that the manner in which petitioner committed the crime demonstrated an exceptionally callous disregard for human suffering (see id., § 2281(c)(1)(D)), also on "the situation with the two Monterey County Deputy Sheriffs."  Second, the Board found that petitioner has a previous record of violence.  See id., § 2281(c)(2).  The Board noted that petitioner had previously attempted to inflict serious injuries on victims, had record of violence and assaultive behavior, displayed an escalating pattern of criminal conduct and violence, and had failed many prior societal attempts to correct his criminal behavior – four terms in CYA, a term in prison, and juvenile and adult probation.  See id., § 2281(c)(2), (d)(1), & (d)(6).  Third, the Board found that petitioner had not engaged in sufficient programming since his prior suitability hearing because the panel in 2003 had recommended that he participate in self-help and he had not done so.  See id., § 2281(d)(9).  Fourth, the Board found that petitioner's 2002 prison disciplinary conviction for circumventing mail procedures posed a potential serious breach to institutional safety and security even though it did not involve violence.  These latter two findings take on even greater significance because they relate to petitioner's behavior since his incarceration.

The court must determine whether the Board's findings are supported by evidence in the record bearing indicia of reliability and, if so, whether that evidence suffices to support the

1    determination that petitioner presented a current threat to public safety at the time of his 2005

2    hearing.  See Lawrence, 44 Cal. 4th at 1210-11.[9]  After careful review of the record, and after

3    taking into consideration the Ninth Circuit decisions in Biggs, Sass and Irons, this court

4    concludes that petitioner is not entitled to federal habeas relief with respect to his due process

5    challenge to the Board's 2005 decision denying him parole.  Rather, that decision was supported

6    by "some evidence" that bore "indicia of reliability."  Jancsek, 833 F.2d at 1390.

7            Respondent merely argues in cursory fashion that the circumstances of the

8    commitment offense and petitioner's prior criminal record alone constitute some evidence of

9    unsuitability and provided a sufficient basis for the Board's 2005 decision.  (Answer at 9.)  The

10   undersigned disagrees.  After thirty years of imprisonment, the denial of parole to petitioner

11   based solely in reliance on the gravity of his commitment offense and his conduct prior to

12   imprisonment would raise serious questions involving petitioner's protected liberty interest in

13   parole.  See Irons, 505 F.3d at 853-54; Biggs, 334 F.2d at 913.  However, those were not the sole

14   factors relied upon by the Board in this case.   In denying parole the Board found petitioner had

15   not engaged in sufficient programming because in 2003 a Board panel had recommended that he

16   participate in self-help and he had not done so.   The Board also cited petitioner's May 2002

17   disciplinary conviction for circumventing prison mail procedures, finding that conduct to have

18   constituted a potentially serious breach of security within the institution.[10]

19
        [9]  As noted at the outset, petitioner was sentenced to seven years to life in state prison.  At
20   the time of the 2005 parole hearing he had served approximately thirty years on that sentence and
     had therefore served far longer than the minimum number of years required.  See Irons, 505 F.3d
21   at 665.

22       [10]  Although difficult to read in the manner presented to the court, it appears that in 2002
     petitioner was suspected of having stolen a state telephone and of smuggling mail into and out of
23   the prison.  (Answer, Ex. 1, Part 1 at 73-74.)  Petitioner was eventually found guilty of a prison
     rules violation after he admitted that he had a non-custodial staff member smuggle mail into the
24   prison for him thereby circumventing the institutional mail screening procedures.  (Id. at 75.)
     Petitioner was counseled and reprimanded as a result of the conviction.  (Id.)  To the extent
25   petitioner claims that the rules violation report regarding his circumvention of mail procedures
     was unreliable, his argument lacks merit.  Petitioner does not dispute that he did circumvent mail
26   procedures as discussed in the report and, indeed, he pled guilty to the violation.  (See id. at 75.)

1     Turning first to the Board's finding that petitioner had not engaged in sufficient

2 programming since his 2003 suitability hearing, the court finds it is impossible to determine from

3 the Board's 2005 decision what it was referring to in this regard.  In announcing the Board's

4 decision in 2005 the Commissioner cryptically stated:

5               Sir, the Panel feels that you haven't participated sufficiently in self-
              help.  And let me digress for a moment.  The Panel last year – I
6              read specifically, I wanted to go back and read their finding and
              recommendation to you.  Those people had the key to you getting
7              out.  The key was in their hand and what they were telling you is
              what you need to do, and we're going to do the same thing today
8              and I hope that the subsequent Panel's going to take a look at your
              progress.  So you call – I think the term spinning your wheels or
9              something like that.  Look at what the Panel tells you as a key.  It's
              a key that's going to get you what you want.

10

11 (Answer, Ex. 1, Part 1 at 59.)  Respondent has failed to submit the Board's 2003 decision as part

12 of the record in this case.[11]  This court has combed the record before it and found absolutely no

13 evidence to support the Board's conclusion that petitioner had failed to adequately engage in self-

14 help programming.  Instead, the record is replete with positive psychological evaluations

15 concluding that petitioner was a suitable candidate for release on parole along with certificates

16 and letters from prison staff lauding his achievements, job offers and letters of support from his

17 family and community.  Even under the minimally stringent "some evidence" standard the

18 Board's finding in this regard cannot be upheld and the implicit determination of the state courts

19 to the contrary was therefore unreasonable under clearly established federal law.

20     Finally, the court considers the Board's reliance on petitioner's 2002 prison

21 disciplinary conviction in finding him unsuitable for parole in 2005.  The court recognizes that

22 other than this single lapse, petitioner had apparently been discipline-free for the twenty-three

23

24

25     [11]  Parts of the record lodged with the court reflect that petitioner has advised the state
courts that the Board's 2003 decision denying him parole has been lost or is "in [the] possession
26 of [the] 2005 [Board] attorney."  (Answer, Ex. 5 at 9.)

1   years of his imprisonment prior to his 2005 hearing.[12]  Nonetheless, institutional behavior is one

2   of the suitability factors the Board is authorized to consider under state law.  See Cal. Code Regs.

3   tit. 15, § 2281(d)(9).  Petitioner's disciplinary conviction in July of 2002 was somewhat near in

4   time to his 2005 parole hearing.  Albeit a slim reed, that disciplinary conviction constitutes

5   "some evidence" of petitioner's unsuitability for release in 2005, when coupled with the facts of

6   petitioner's commitment offenses and his prior criminal violence.[13]

7               For the reasons explained above, this is a close case.  Nonetheless, the Board's

8   decision therefore did not deny petitioner due process under the minimally stringent test set forth

9   in Biggs, Sass, and Irons.  It cannot be said at this point that the decision of the Santa Clara

10  County Superior Court rejecting this aspect of petitioner's due process claim is contrary to or an

11  unreasonable application of the federal due process principles discussed above.[14]  Accordingly,

12  petitioner is not entitled to relief on his claim that the Board's 2005 decision finding him

13  _____

14      [12]  However, the record reflects reference to six prison rules violations issued against
    petitioner in the first seven years of confinement following his 1976 murder conviction.
15  (Answer, Ex. 1, Part 2 at 13-14; Ex. 5 at 74-80.)

16      [13]  Given petitioner's many years of disciplinary-free behavior in prison and the non-
    violent nature of his 2002 disciplinary conviction, as recognized by the Board in 2005, any
17  extended reliance on this evidence to deny parole in the future may well pose serious due process
    concerns as well.  Indeed, were petitioner denied parole in 2007 on this same evidence of record,
18  the granting of habeas relief due to a due process violation would likely be appropriate even
    under the minimally stringent standard applicable here.  The Deputy District Attorney appearing
19  at petitioner's 2005 hearing appeared to recognize as much, attempting to "clarify" the Board's
    conclusions in light of the generally favorable nature of the evidence before it.  (See Answer, Ex.
20  1, Part 1 at 63.)

21      [14]  Petitioner's final argument that the Board relied on unreliable evidence of unsuitability
    and ignored relevant suitability criteria is also without merit.  With regard to the evidence of
22  suitability, the court notes that the Board did explicitly consider at least five of the nine
    suitability factors in its decision.  See Cal. Code Regs. tit. 15, § 2281(d)(1) (juvenile record),
23  (d)(2) (social history), (d)(6) (criminal history), (d)(8) (future plans), and (d)(9) (institutional
    behavior).  Other suitability factors were discussed in the hearing on questioning by the panel.
24  Id., § 2281(d)(3) (remorse), (d)(4) (motivation for crime).  One factor was not relevant.  Id., §
    2281(d)(5) (battered woman syndrome).  The remaining factor, present age, was not explicitly
25  discussed in the hearing or decision.  However, the Board's failure to expressly consider some of
    the suitability factors does not amount to a due process violation here, because, even considering
26  those factors, some evidence remains that supports the Board's conclusion that petitioner posed a
    threat to public safety in 2005.

1    unsuitable for parole violated his right to due process because of the lack of evidence supporting

2    that conclusion.  Sass, 461 F.3d at 1129; Irons, 505 F.3d at 664-65.

3          B.  Due Process – Determinate Sentencing Law Criteria vs. Indeterminate Sentencing

4    Law Criteria

5          Petitioner also contends that the Board deprived him of due process by applying

6    the suitability criteria applicable under California's Determinate Sentencing Law (DSL) to his

7    case when he was convicted under California's Indeterminate Sentencing Law (ISL).  This claim

8    is foreclosed by the decision in Connor v. Estelle, 981 F.2d 1032 (9th Cir. 1992), in which the

9    Ninth Circuit held that application of DSL, rather than ISL, parole suitability criteria does not

10   create a due process violation, because "[t]he ISL and DSL guidelines apply identical criteria in

11   determining parole suitability."  981 F.2d at 1034-35 (citing In re Duarte, 143 Cal. App. 3d 943,

12   951 (1983)).

13         C.  Due Process – Alleged "No Parole" Policy

14         Next, petitioner claims that he was denied due process because the Board "has

15   totally failed in its intended function and has reduced its function to the advancement of contrary

16   political agendas."  (Am. Pet. at 24.)  In support of that claim, petitioner has submitted  a

17   declaration from Albert M. Leddy dated March 5, 1999, stating that the Board of Prison Terms

18   operated under a "no parole" policy during the administrations of former Governors Pete Wilson

19   and Gray Davis for prisoners sentenced to an indeterminate life term.  (Pet., Ex. X.)  The Ninth

20   Circuit Court of Appeal has acknowledged that California inmates have a due process right to

21   parole consideration by neutral decision-makers.  See O'Bremski v. Maas, 915 F.2d 418, 422

22   (9th Cir. 1990) (an inmate is "entitled to have his release date considered by a Board that [is] free

23   from bias or prejudice").  Accordingly, parole board officials owe a duty to potential parolees "to

24   render impartial decisions in cases and controversies that excite strong feelings because the

25   litigant's liberty is at stake."  Id. (quoting Sellars v. Procunier, 641 F.2d 1295, 1303 (9th Cir.

26   /////

1   1981)).  Indeed, "a fair trial in a fair tribunal is a basic requirement of due process."  In re

2   Murchison, 349 U.S. 133, 136 (1955).

3            However, petitioner has presented no evidence of an anti-parole bias on the part of

4   the Board in 2005.  The parole denial challenged in this habeas action occurred when Arnold

5   Schwarzenegger was Governor of California.  Neither Pete Wilson nor Gray Davis were the

6   Governor of California at the time of petitioner's suitability hearing in 2005, and petitioner has

7   offered no evidence suggesting that the Board was operating under a no-parole policy for life

8   prisoners after Governor Davis left office.  Therefore, petitioner is not entitled to relief on this

9   claim.

10           D.  Due Process – Deferral of Subsequent Hearing for Two Years

11           Petitioner argues that the Board deprived him of due process when it deferred his

12  next parole consideration hearing for two years.  Petitioner claims that no evidence in the record

13  supports the Board's deferral decision.  This claim appears to be based entirely on state law.  As

14  noted above, federal habeas corpus relief does not lie for a violation of state law.  Estelle, 502

15  U.S. at 67-68.  Petitioner has cited no federal authority for the proposition that a due process

16  violation results if a state parole board defers parole suitability hearings beyond a certain period

17  of time.  Cf. Garner v. Jones, 529 U.S. 244, 251-52 (2000) (retroactive application of Board's

18  amended rule, changing frequency of required reconsideration hearings for inmates serving life

19  sentences from every three years to every eight years, did not necessarily violate Ex Post Facto

20  Clause); Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 501 (1995) (California statute amending

21  parole procedures to allow the Board to decrease the frequency of parole suitability hearings

22  under certain circumstances did not violate Ex Post Facto Clause as applied to petitioner who

23  was convicted prior to the amendment).  Even if the Board's decision to defer petitioner's next

24  parole suitability hearing for two years was in violation of some provision of California law, a

25  violation of state mandated procedures will constitute a due process violation only if it brings

26  about a fundamentally unfair result.  Estelle, 502 U.S. at 65.  Because there was evidence in the

1  record indicating that petitioner was unsuitable for parole in 2005, the Board's deferral of his

2  next hearing for two years (as opposed to one) is not fundamentally unfair.

3         E.  <u>Ex Post Facto – Reliance on Immutable Facts to Deny Parole</u>

4         Petitioner claims that the Board violated the federal constitutional prohibition on

5  ex post facto laws when it denied him parole in 2005.  In this regard, he argues that by relying on

6  the immutable facts of his crimes and past history and ignoring relevant evidence of his

7  suitability for parole, the Board has transformed his sentence of life with the possibility of parole

8  to one of life without the possibility of parole.

9         The Constitution provides that "No State shall . . . pass any . . . ex post facto

10  Law."  U.S. Const. art. I, § 10.  <u>See also</u> <u>Himes</u>, 336 F.3d at 854.  A law violates the Ex Post

11  Facto Clause if it: (1) punishes as criminal an act that was not criminal when it was committed;

12  (2) makes a crime's punishment greater than when the crime was committed; or (3) deprives a

13  person of a defense available at the time the crime was committed.  <u>See</u> <u>Collins v. Youngblood</u>,

14  497 U.S. 37, 52 (1990).  The Ex Post Facto Clause "is aimed at laws that retroactively alter the

15  definition of crimes or increase the punishment for criminal acts."  <u>Himes</u>, 336 F.3d at 854

16  (quoting <u>Souch v. Schaivo</u>, 289 F.3d 616, 620 (9th Cir. 2002)).  <u>See also</u> <u>Cal. Dep't of Corr. v.</u>

17  <u>Morales</u>, 514 U.S. 499, 504 (1995).  The Ex Post Facto Clause may also be violated if: (1) state

18  regulations have been applied retroactively to a defendant; and (2) the new regulations have

19  created a "sufficient risk" of increasing the punishment attached to the defendant's crimes.

20  <u>Himes</u>, 336 F.3d at 854.  However, not every law that disadvantages a defendant is a prohibited

21  ex post facto law.  In order to violate the clause, the law must essentially alter "the definition of

22  criminal conduct" or increase the "punishment for the crime."  <u>Lynce v. Mathis</u>, 519 U.S. 433,

23  441-42 (1997).

24         Here, the Board has not increased petitioner's punishment.  Petitioner was

25  sentenced to a term of seven years to life in state prison.  That sentence contemplates a potential

26  life term in prison.  Therefore the granting of parole in petitioner's case is not mandatory, but

1   merely possible.  While petitioner might have hoped or expected to be released from prison

2   sooner, the Board's decision to deny him a parole release date has not enhanced his punishment

3   or sentence.  Accordingly, petitioner is not entitled to habeas relief with respect to this claim.

4       F.   Ex Post Facto – Indeterminate Sentencing Law Criteria vs. Determinate Sentencing

5   Law Criteria

6           In arguing that the Board's use of DSL, rather than ISL, criteria deprived him of

7   due process, petitioner appears to argue that such application also violates the Ex Post Facto

8   Clause.  However, such a challenge, like the parallel due process challenge, is foreclosed by the

9   decision in Connor v. Estelle in which the Ninth Circuit held that the criteria applied under ISL

10  and DSL are identical.  See 981 F.2d at 1034-35.

11      G.   Cruel and Unusual Punishment

12          Lastly, petitioner claims that his continued incarceration violates the Eighth

13  Amendment proscription against cruel and unusual punishment.   In Lockyer v. Andrade, 538

14  U.S. 63 (2003), the United States Supreme Court found that in addressing an Eighth Amendment

15  challenge to a sentence, the "only relevant clearly established law amenable to the 'contrary to'

16  or 'unreasonable application of' framework is the gross disproportionality principle, the precise

17  contours of which are unclear and applicable only in the 'exceedingly rare' and 'extreme' case."

18  Id. at 73 (citing Harmelin v. Michigan, 501 U.S. 957, 1001 (1991); Solem v. Helm, 463 U.S. 277,

19  290 (1983); and Rummel v. Estelle, 445 U.S. 263, 272 (1980)).  See also Ramirez v. Castro, 365

20  F.3d 755, 775 (9th Cir. 2004)  Under that principle, the Eight Amendment forbids only extreme

21  sentences that are grossly disproportionate to the crime.  Harmelin, 501 U.S. at 1001.

22  Petitioner's sentence does not fall within the type of "exceedingly rare" circumstance that would

23  support a finding that his sentence violates the Eighth Amendment.  Petitioner was convicted of

24  first degree murder and assaulting peace officers.  His sentence, even if he remains in prison for

25  life, is not grossly disproportionate to these crimes.  See Harmelin, 501 U.S. at 1004-05 (life

26  imprisonment without possibility of parole for possession of 24 ounces of cocaine raises no

1   inference of gross disproportionality); see also Lockyer, 538 U.S. at 75 (where petitioner was

2   convicted of petty theft of $150.00 worth of videotapes with prior convictions, it was not an

3   unreasonable application of clearly established federal law for the California Court of Appeal to

4   affirm a sentence of two consecutive twenty-five year-to-life imprisonment terms); Ewing v.

5   California, 538 U.S. 11, 29 (2003) (holding that a sentence of twenty-five years to life in prison

6   imposed on a grand theft conviction involving the theft of three golf clubs from a pro shop was

7   not grossly disproportionate and did not violate the Eighth Amendment).  Here, the rejection of

8   petitioner's Eighth Amendment claim by California courts was neither contrary to, nor an

9   unreasonable application of clearly established federal law.  Therefore, petitioner is also not

10  entitled to habeas relief with respect to his Eighth Amendment claim.

11                                          CONCLUSION

12          For the reasons set forth above, IT IS HEREBY RECOMMENDED that

13  petitioner's application for a writ of habeas corpus be denied.

14          These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

16  one days after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within fourteen days after service of the objections.  The parties are

20  advised that failure to file objections within the specified time may waive the right to appeal the

21  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

22  DATED: December 7, 2009.

23

24  _____

25  DAD:ew                          DALE A. DROZD
    bettencourt2246.hc2             UNITED STATES MAGISTRATE JUDGE

26